JOURNAL ENTRY and OPINION
{¶ 1} Appellant, the mother of six children, appeals the trial court's determination that appellee, Cuyahoga County Department of Children and Family Services ("CCDCFS"), be awarded permanent custody of five of her six children, and legal custody of her other child be granted to that child's biological father.
 {¶ 2} On May 22, 2001, appellant's husband, Jermaine Davis ("Davis"),[1] physically abused three of appellant's children while appellant was present in the home.[2] In particular, Davis punched A.E. in the face and back causing those areas to bruise and swell, punched Ka.P.[3] in the face for leaving her homework on the table, and ordered C.D. to take off his clothes, and then Davis proceeded to whip him with a leather-braided belt across the back, buttocks, legs, arms, face, and penis, causing open wounds to C.D.'s back and severe bruising and abrasions to the rest of his body. When police arrived at the home, appellant attempted to hide C.D. in a back room so that they would not see his injuries, but she did not succeed.
 {¶ 3} On May 29, 2001, all five of appellant's children were removed from her home, and on the following day, CCDCFS filed a complaint for abuse, dependency, and neglect, seeking permanent custody of four of appellant's children (Ka.P., Kk.P., C.D., and J.P.) and seeking legal custody of A.E. to her legal father. In August 2001, Davis was convicted of two counts of child endangering as to A.E. and C.D. and sentenced to five years in prison and, in November 2001, appellant was convicted of felony obstruction of justice and placed on probation for five years. In December 2001, appellant's sixth child, B.D., was born and removed from the hospital by CCDCFS. Because of B.D.'s birth, CCDCFS amended their original complaint to include B.D. as one of the five children of which CCDCFS sought permanent custody.
 {¶ 4} At the adjudication phase in July 2002, appellant admitted the abuse alleged in the complaint, as well as the allegations that she failed to protect her children from such abuse. After two continuances, the disposition phase took place in February 2003. CCDCFS called eight witnesses to testify at the disposition phase. The first witness was psychologist, Dr. Ezzo, who testified that he conducted a clinical interview with appellant and an interview with three of the children. Although the results from one of the two tests conducted in the clinical interview were invalid because items were double-marked or left blank, Dr. Ezzo testified that the results from the symptom checklist test demonstrated that appellant had thoughts and experienced feelings of inadequacy, inferiority, self-doubt, and discomfort during interpersonal interaction. Dr. Ezzo testified that such feelings have a negative impact on a person's ability to be an appropriate parent and, had the results from the first test been valid, the negative impact would have increased dramatically.
 {¶ 5} Dr. Ezzo also testified that when appellant failed to attend the interactional interview he had scheduled with appellant and her children, he conducted meaningful interviews with Ka.P., Kk.P., and A.E. According to his interview with Ka.P., Davis punched, kicked, and choked her many times while appellant was present and did not try to stop him. Ka.P. also told Dr. Ezzo that appellant seemed to care more about the dog than her because she at least yelled at Davis to stop when he was abusing the dog. In his interview with Kk.P., Dr. Ezzo learned that Davis, on numerous occasions, had thrown him against the wall, gave him black eyes, kicked him in the stomach, whipped him with a belt, and held a knife to his throat while appellant was present, knew what was going on, but did not do anything to stop Davis. Dr. Ezzo also learned that Davis threw A.E. against the wall and choked and whipped her while appellant was present and did not try to stop him.
 {¶ 6} Dr. Ezzo further testified that Ka.P., Kk.P., and A.E. saw the incident where Davis stripped C.D. and whipped him with a leather-braided belt while appellant was home. All three children expressed to Dr. Ezzo that they did not want to live with appellant because she would probably allow Davis to return to the home after he served his prison term. Based on these interviews, Dr. Ezzo concluded that the children should not be reunited with appellant and recommended either permanent custody or a planned permanent living arrangement.
 {¶ 7} CCDCFS's second witness, Patrick Nicolino ("Nicolino"), employed by the Cuyahoga County Witness/Victim Service Center, testified that he originally concluded that reunification should take place because appellant had completed her domestic violence program and, in his opinion, had demonstrated her ability to protect the children. However, after further inquiry and additional information from CCDCFS, Nicolino withdrew his original conclusion, observing that appellant failed to acknowledge her role in allowing the abuse to occur and instead, blamed the abuse on her family's involvement. As a result, Nicolino concluded that appellant and her children should not be reunified.
 {¶ 8} One of appellant's cousins, Darnese Standberry ("Standberry"), testified that when appellant lived with her in 1991 and 1992, appellant would hit Ka.P. and Kk.P. and lock them in the bedroom so that she could do other things. Standberry also testified that appellant had been in abusive relationships, including her relationship with Davis.
 {¶ 9} Appellant's mother, Beverly Jenkins ("Jenkins"), testified that she had seen belt marks on the children several times in the last two years, which she knew Davis caused, and saw scars on the children in the last four years.
 {¶ 10} CCDCFS's next two witnesses, John Stockwell and Francina Stockwell (collectively, the "Stockwells"), testified that they have had possession of Ka.P., Kk.P., C.D., and J.P. since June 2001. The Stockwells testified that when the four children arrived at their house, they were very violent and would fight, punch, hit, and kick one another. They currently have a problem with Kk.P.'s violent tendencies at school. The Stockwells also testified that they immediately observed the serious bruises and marks on C.D.'s back down to his knees (which bruises and marks are still visible), they had a problem with getting C.D. to take off his clothes to take a bath, and C.D. needs tutoring and speech therapy.
 {¶ 11} The Stockwells also testified that there was an open invitation to appellant to visit the children at their house, but after a few months, appellant stopped visiting and requested a more limited and supervised visitation at Metzenbaum Center to avoid any problems that existed between appellant and the Stockwells. Prior to the visits at Metzenbaum Center, the Stockwells described the visits as abnormal because the children played video games throughout the visit and did not pay appellant any attention. also testified that appellant threatened her and told her that she was going to "get" everybody who is involved in the case.
 {¶ 12} Appellant's sister, Theodorsha Lakeesha Orr ("Orr"), testified that she was present at the house on May 22, 2001 and saw Davis beat Ka.P. and whip C.D. Orr stated that she was on the phone at the time, witnessed the beatings, saw a patrol car from the Cuyahoga Metropolitan Housing Authority ("CMHA"), and alerted CMHA to the incident. Orr also testified that although appellant was asleep in the back room, C.D. was screaming and crying so loud that anyone, including neighbors, would have heard his screams. In addition, Orr testified that although she was present on other occasions when Davis beat the children, she never called the police or alerted any authorities.
 {¶ 13} Finally, Paul Wilson ("Wilson"), a social worker at CCDCFS testified that he supervised the visits that appellant had with her children at Metzenbaum. During those visits, appellant spoke to him more than interacting or speaking with her children.
 {¶ 14} Appellant testified that she was unaware that Ka.P. and Kk.P. suffered any wounds from beatings, but she recalled that in 1996, Davis whipped Ka.P. and Kk.P. so hard with a belt that they had visible marks. After the incident in 1996, appellant told Davis to move out, but allowed him to return to the home in 1998. At the time of the hearing, appellant had not filed for divorce from Davis and did not state that she planned on doing so in the future. Appellant testified that she was beaten and whipped as a child, and that she was physically and verbally abused by Davis and previous men. Appellant further testified that her relationship with Ka.P. and Kk.P. has deteriorated, she does not know where A.E. goes to school, and has never spoken to A.E.'s teachers.
 {¶ 15} Upon consideration of the evidence presented, the trial court awarded CCDCFS permanent custody of Ka.P., Kk.P., C.D., J.P., and B.D., finding that the parents "have failed or refused to provide basic necessities, regular support, visit or communicate with the children when able to do so or, by other actions, have shown an unwillingness to provide an adequate permanent home for the children." The trial court also granted legal custody of A.E. to her father because CCDCFS showed by "clear and convincing evidence that it is in the best interest of the child to grant legal custody" to him. Appellant now appeals.
 I {¶ 16} We will address appellant's first and second assignments of error together, as appellant contends that the trial court erred by not appointing a guardian ad litem for her, and by failing to appoint such guardian ad litem, the trial court violated her constitutional rights by accepting certain admissions at the adjudication phase. In particular, appellant argues that her inability to understand and answer clearly the questions asked of her at trial and during the clinical interview with Dr. Ezzo were sufficient reasons to question her mental competence and appoint a guardian ad litem for her. Appellant also argues that, because of her mental incompetence, any admissions at the adjudication phase were not made knowingly, intelligently, or voluntarily. However, appellant's arguments are without merit.
 {¶ 17} R.C. 2151.281 provides, in pertinent part:
 {¶ 18} "(C) In any proceeding concerning an alleged or adjudicated delinquent, unruly, abused, neglected, or dependent child in which the parent appears to be mentally incompetent or is under eighteen years of age, the court shall appoint a guardian ad litem to protect the interest of that parent.
 {¶ 19} "* * *
 {¶ 20} "(E) A parent who is eighteen years of age or older and not mentally incompetent shall be deemed sui juris for the purpose of any proceeding relative to a child of the parent who is alleged or adjudicated to be an abused, neglected, or dependent child."
 {¶ 21} Also, Juv.R. 4(B)(3) provides that the court shall appoint a guardian ad litem when the parent is under eighteen years of age or appears to be mentally incompetent.
 {¶ 22} The first step in determining whether a juvenile court complied with Juv.R. 4(B) and R.C. 2151.281(C) is to consider whether the adult appeared "mentally incompetent" during the trial court proceedings. In re Anderson, Athens App. No. 02CA38, 2002-Ohio-7405, ¶ 7. Simply because an adult in a juvenile proceeding "may appear to be mentally impaired, that does not mean that he or she is mentally incompetent." In reKing-Bolen, Medina App. Nos. 3196-M, 3231-M, 3200-M, and 3201-M, 2001-Ohio-1412. In fact, even when an adult is mentally retarded, that, "in itself, is not enough to support a claim of incompetence." Id., citing Penry v. Lynaugh (1989),492 U.S. 302, 106 L.Ed.2d 256, 109 S.Ct. 2934.
 {¶ 23} Although "it is the appearance of incompetence and not an actual finding of such that triggers the requirement of an appointment of a guardian ad litem," there is nothing in the record before us that suggests that appellant appeared incompetent at any of the proceedings. See In re Holmes (Feb. 15, 2001), Cuyahoga App. No. 77785 (finding error where the adult was determined, pursuant to a psychological evaluation, to be on the borderline range of mental functioning and had serious intellectual limitations that would require extra-parental assistance). Here, Dr. Ezzo was unable to conclude that appellant suffered from any mental illness because the results of one of the tests conducted in the clinical interview with appellant were invalid. Dr. Ezzo also testified that appellant had no history of psychosis and appeared cooperative, lucid, and goal-oriented. Simply because appellant needed clarity on some of the questions asked of her during the proceedings does not mean that appellant appeared mentally incompetent.
 {¶ 24} Likewise, "the failure to appoint a guardian ad litem does not constitute reversible error where no request for a guardian ad litem is made or the party cannot show prejudice." See In re King-Bolen. Here, neither appellant nor her attorney (who had represented appellant over the course of a year) indicated to the trial court at any time that a guardian ad litem be appointed on appellant's behalf or that appellant's mental competence was an issue. In fact, at the preliminary hearing in June 2002, upon being asked by the trial court, appellant's attorney stated that appellant did not need to have a guardian ad litem appointed on her behalf. Because appellant did not appear mentally incompetent at any stage of the proceedings and never requested a guardian ad litem appointment, the trial court did not err in failing to appoint a guardian ad litem on behalf of appellant.
 {¶ 25} Moreover, although appellant argues that the trial court violated due process when it accepted appellant's admissions to the amended complaint at the adjudication phase, it appears from the record that the trial court "faithfully adhere[d]" to the requirements of Juv.R. 29. See In re JeremyN., Cuyahoga App. No. 79508, 2002-Ohio-3897, ¶ 12. Juv.R. 29(D) provides in pertinent part:
 {¶ 26} "Initial procedure upon entry of an admission. The court may refuse to accept an admission and shall not accept an admission without addressing the party personally and determining both of the following:
 {¶ 27} "(1) The party is making the admission voluntarily with understanding of the nature of the allegations and the consequences of the admission;
 {¶ 28} "(2) The party understands that by entering an admission the party is waiving the right to challenge the witnesses and evidence against the party, to remain silent, and to introduce evidence at the adjudicatory hearing."
 {¶ 29} Here, the trial court engaged in a lengthy colloquy with appellant at the adjudication phase in strict accordance with Juv.R. 29(D). The record is replete with appellant's acknowledgment and full comprehension that by admitting to the allegations of abuse in the amended complaint, she was waiving her right to challenge the witnesses and evidence on that issue, waiving her right to remain silent, and waiving her right to introduce evidence on that issue. In addition, the trial court read the allegations of abuse to appellant, asked appellant if she understood what each allegation and subsequent admission meant, and if appellant stated that she did not understand, the trial court explained until appellant stated that she understood. Because the trial court followed the mandates of Juv.R. 29(D) in accepting appellant's admissions at the adjudication phase, the trial court did not violate appellant's due process rights. Thus, appellant's first and second assignments of error are overruled.
 II {¶ 30} Because the gravamen of appellant's third and fourth assignments of error involve a similar analysis, we will address them together. Appellant contends that the trial court erred by failing to order a planned permanent living arrangement in lieu of granting permanent custody and that the award granting permanent custody to CCDCFS was against the manifest weight of the evidence. Appellant's contentions lack merit.
 {¶ 31} R.C. 2151.412(F) provides as follows:
 {¶ 32} "(1) All case plans for children in temporary custody shall have the following general goals:
 {¶ 33} "(a) Consistent with the best interest and special needs of the child, to achieve a safe out-of-home placement in the least restrictive, most family-like setting available and in close proximity to the home from which the child was removed or the home in which the child will be permanently placed; * * *."
 {¶ 34} R.C. 2151.412 applies "by its own terms to the development and review of case plans, rather than to permanent custody determinations." In re Harris (Nov. 2, 2000), Cuyahoga App. No. 76631. There is nothing in R.C. 2151.412 that obligates the court "to award custody to a relative rather than grant permanent custody to the agency. In reviewing the options, the court must put the best interests of the child first." In reBunch (Aug. 3, 2000), Cuyahoga App. No. 76493.
 {¶ 35} Here, appellant argues that the trial court could have ordered a planned permanent living arrangement instead of awarding CCDCFS permanent custody. However, R.C. 2151.353(A)(5) provides that the trial court may place a child in a planned permanent living arrangement only if the statutory requirements are satisfied and only if CCDCFS requested the court to place the child in such arrangement. CCDCFS never requested a planned permanent living arrangement. In fact, because CCDCFS always sought permanent custody of appellant's five children and legal custody of A.E. to her father, the trial court, according to R.C.2151.353(A)(5), could not have ordered a planned permanent living arrangement.
 {¶ 36} Moreover, R.C. 2151.414(B)(1) provides in pertinent part:
 {¶ 37} "Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 {¶ 38} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 39} "(b) The child is abandoned.
 {¶ 40} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 {¶ 41} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999."
 {¶ 42} Here, the trial court found, pursuant to R.C.2151.414(B)(1)(a), that appellant's five children could not be placed with their parents because they "have failed or refused to provide basic necessities, regular support, visit or communicate with the children when able to do so or, by other actions, have shown an unwillingness to provide an adequate permanent home for the children." The evidence revealed that although appellant had an open invitation to visit her children at the Stockwells' house, appellant visited them only a few times before stopping altogether in October 2001. Rather than have unlimited and open visitation with her children, appellant requested limited and restricted visitation with her children at Metzenbaum Center because she did not personally "get along" with the Stockwells.
 {¶ 43} By failing to appear at the interactional interview, appellant also demonstrated a lack of commitment to her children. Likewise, appellant's own admissions that she failed to protect her children when Davis physically abused the children coupled with testimony that appellant cared more about the safety of the dog than the safety of her own children, demonstrates that appellant is unwilling to provide a safe home for her children. Based on the evidence, the trial court, as required by R.C.2151.414(E), found that the children cannot or should not be returned to their parents within a reasonable time.
 {¶ 44} After determining that appellant's children cannot or should not be placed with either parent within a reasonable time, the trial court, pursuant to R.C. 2151.414(D) and (E), found that awarding permanent custody to CCDCFS was in the best interest of the children.
 {¶ 45} R.C. 2151.414(D) provides as follows:
 {¶ 46} "In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353
[2151.35.3] or division (C) of section 2151.415 [2151.41.5] of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
 {¶ 47} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 48} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 49} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 50} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 51} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 52} Also, R.C. 2151.414(E)(7) provides:
 {¶ 53} "(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 [2151.35.3] of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 [2151.35.3] of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 {¶ 54} "* * *
 {¶ 55} "(7) The parent has been convicted of or pleaded guilty to one of the following:
 {¶ 56} "(a) An offense under section 2903.01, 2903.02, or2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
 {¶ 57} "(b) An offense under section 2903.11, 2903.12, or2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 {¶ 58} "(c) An offense under division (B)(2) of section2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
 {¶ 59} "(d) An offense under section 2907.02, 2907.03,2907.04, 2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 {¶ 60} "(e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section."
 {¶ 61} This court in In re Awkal (1994),95 Ohio App.3d 309, 316, 642 N.E.2d 424, held as follows:
 {¶ 62} "R.C. 2151.414(D) is written broadly and requires the juvenile court judge to consider all factors that are relevant to the best interests of the child. The purpose of a far-reaching inquiry is to allow the judge to make a fully informed decision on an issue as important as whether to terminate parental rights, privileges and responsibilities. The discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. Moreover, the knowledge the juvenile court gains at the adjudicatory hearing through viewing the witnesses and observing their demeanor, gestures and voice inflections and using these observations in weighing the credibility of the proffered testimony cannot be conveyed to a reviewing court by a printed record. Hence, this reviewing court will not overturn a permanent custody order unless the trial court has acted in a manner that is arbitrary, unreasonable or capricious." (Internal citations omitted.)
 {¶ 63} Here, there was evidence that the interaction between appellant and her children was abnormal during visits, appellant admitted that her relationship with Ka.P. and Kk.P. had deteriorated, that the children expressed a lack of desire, and even fear, of returning to live with appellant, the children expressed that they did not want to visit nor have phone contact with appellant, and the children were in placement for 12 or more months of a consecutive 22-month period. The trial court also found that although the children needed a secure placement, the children could not or should not be placed with their parents based on the reasons pursuant to R.C. 2151.414(B)(1)(a) and2151.414(E). Finally, because Davis was convicted of child endangering as to his son, C.D., and C.D.'s sibling, A.E., R.C.2151.414(D)(5) was also satisfied.
 {¶ 64} Because there was evidence that satisfied all of the factors listed in R.C. 2151.414(D), it cannot be said that awarding permanent custody to CCDCFS was against the manifest weight of the evidence nor an abuse of the trial court's discretion. Indeed, the manifest weight of the evidence supports the trial court's award of permanent custody. Thus, appellant's third and fourth assignments of error are overruled.
 III {¶ 65} Finally, appellant contends in her fifth assignment of error that the trial court acted with bias or prejudice against appellant by inquiring about the adoptive placement of the children, and that the trial court abused its discretion when it prevented appellant from filing objections to the magistrate's journal entry of May 7, 2002. Appellant's contentions are without merit.
 {¶ 66} First, appellant argues that the trial court prejudged her before the close of the case by asking what the adoptive options were for each child. Contrary to appellant's argument, the trial court specifically asked, as it is permitted to do under Section 1356.21(b)(4), Title 45, C.F.R. what the permanency plan was for the children. See In re D.C., Summit App. No. 21008, 2003-Ohio-97 (holding that if a judicial determination was not made that the agency used reasonable efforts to finalize a permanency plan for a child, then the child becomes ineligible to receive federal funds). Here, the trial court simply fulfilled its duty regarding CCDCFS' reasonable efforts to finalize the permanency plan so that appellant's children would still be eligible for federal funding while in foster care. There is no evidence that the trial court, in fulfilling its duty, harbored any bias or prejudice against the appellant.
 {¶ 67} Second, appellant argues that she was unable to file objections to the magistrate's order of emergency custody on May 7, 2002, where the magistrate ordered the children into shelter care. Appellant complains that she suffered prejudice because the shelter care order had not been journalized. However, appellant was present for the shelter care hearing and she could have filed a motion for hearing requesting that the children be released from shelter care, but failed to do so. Likewise, appellant made no issue as to the non-journalized shelter care order at the preliminary hearing on June 6, 2002. In fact, the first mention of the non-journalized shelter care order was made on July 10, 2002 by the magistrate and, at that time, appellant stipulated on the record to the continuation of the shelter care order. As a result of the stipulation, the trial court noted that "[t]he parties present stipulated that * * * the order of pre-dispositional temporary custody [the order of emergency custody] should continue in effect until July 31, 2002." This entry continuing the order or pre-dispositional temporary custody by stipulation of the parties renders moot any alleged defect in the original order of pre-dispositional temporary custody. SeeIn re F.M., Cuyahoga App. No. 80027, 2002-Ohio-3900, ¶ 16. Thus, appellant's fifth assignment of error is overruled as moot and the decision of the trial court awarding permanent custody to CCDCFS of appellant's five children and granting legal custody of A.E. to her father is affirmed.
 {¶ 68} The judgment is affirmed.
Judgment affirmed.
Cooney and Rocco, JJ., concur.
It is ordered that appellees recover of appellant their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court — Juvenile Court Division to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
N.B. This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc.App.R. 22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R.22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(E). See, also, S.Ct.Prac.R. II, Section 2(A)(1).
[1] Although this court is mindful of the policy to refrain from providing the identity of the parties in any juvenile matter, because of the large number of people involved in this matter, we choose to provide only the full names of the adult parties to avoid confusion and awkwardness in reading this opinion. The full names of all juveniles will remain undisclosed.
[2] Although at the time of the incident, appellant and Davis were not married, they were subsequently married in the year 2001.
[3] For the sake of clarity, because there are two children with the same initials, we will refer to appellant's daughter as "Ka.P." and her son as "Kk.P."